IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

                              *
BARON FINANCIAL CORP., et al.,
                              *
    Plaintiff
                              *
        v.                         CASE NO. SKG-03-3563
                              *
RONY NATANZON, et al.,
                              *
    Defendants
                              *

*    *    *    *    *    *    *    *    *    *    *    *    *


**<u>MEMORANDUM OPINION</u>**

This opinion concerns four of the five counts remaining in

the Second Amended Complaint filed by Baron Financial Corporation

("plaintiff" or "Baron") in this matter.  Specifically at issue

are Count I (Breach of Contract) against defendant Rony Natanzon,

Counts III (Intentional Interference with Contractual Rights) and

IV (Civil Conspiracy to Intentionally Interfere with Contractual

Rights) against individual defendants and four limited liability

companies,[1] and Count X (Fraudulent Transfer of Contractual

Rights) against ERN Acquisition, LLC.  Currently pending before

the Court are the parties' cross-motions for summary judgment on

Count I and defendants' motion for summary judgment on Counts

---

[1] Defendants named in Counts III and IV are Tova Natanzon, Martin
Taylor, Vered Taylor, Amit Natanzon, Harold Taylor, and the following
limited liability companies: MAP, LLC; Nationwide Check Services, LLC;
Nationwide Equipment Sales, LLC; and Nationwide Credit Card Center,
LLC.

III, IV, and X and plaintiff's opposition thereto.  (Papers nos.
110, 124, 125, 129, and 130).  A hearing was held before this
Court on March 5, 2007.  Post hearing briefing was accepted.
(Paper nos.  138, 139, 143).  For the reasons discussed below,
the Court DENIES both parties' motions for summary judgment on
Count I and DENIES defendants' motion for summary judgment on
Counts III, IV, and X.

## I.   Background

As part of the settlement of Civil Action No. MJG-02-1868,[2]
on July 12, 2002, Rony Natanzon ("Mr. Natanzon"), for himself and
as manager and on behalf of ERN, LLC, and Samuel Buchbinder ("Mr.
Buchbinder"), for himself, Michelle Trading Corporation ("MTC"),
and Baron Financial Corporation, entered into a two-part written
agreement consisting of a "Memorandum of Understanding Re:
Settlement Agreement" and a "Rider to Memorandum of Understanding
Re Settlement Agreement."[3]  (Paper no. 110, Ex. A and Ex. B).
Mr. Natanzon and Mr. Buchbinder had at one time been members in
ERN, LLC ("company" or "ERN"), a company involved in the business

---

[2] On May 31, 2002, Michelle Trading Company, an Illinois
Corporation and then member of ERN, LLC, sued Rony Natanzon, the only
other member of ERN, LLC and ERN, LLC's manager, based on alleged
violations of certain agreements seeking injunctive relief, to allow
the removal of Natanzon as manager, the appointment of a new manager,
and to limit salary payments to Natanzon's relatives, inter alia.
(Michelle Trading Corp. v. Natanzon, Case No. MJG-02-CV-1868, Paper
No. 2).

[3] These will individually be referred to as the "MOU" and
"Rider," and collectively referred to as the "settlement agreement" or
"agreement."

of debit and credit card processing, check processing and check
guaranty, and the leasing and sales of point-of-sale terminals
and other equipment related to credit card and check
transactions.  (Paper no. 45, 7).  Among its various provisions,
the agreement set forth the arrangement by which ERN would obtain
Mr. Buchbinder and Baron's interest in the company as well as
repay certain loans made by Baron to the company.  (MOU and
Rider).

According to the agreement's terms, Mr. Natanzon was to
immediately purchase MTC's interest in ERN for $1.00 and to pay
$1,999,999.00 directly to Baron as partial repayment for loans
made to the company.[4]  (Rider ¶ 3).  As security for the payment
of this sum, ERN assigned to Baron residual payments due from its
Concord and CPS portfolio.[5]  (MOU ¶ 4).  Moreover, Mr. Natanzon
agreed to inform Baron "of any event which might affect the
security interests granted" in the agreement.  (Rider ¶ 12).
For as long as the $2 million remained unpaid, the parties agreed
that there would be no payments of insider debt and no insider
distributions other than the "ordinary salaries currently paid"
to Mr. Natanzon and his family and "industry standard commissions

---

[4] The MOU also contained a clause stating that Mr. Buchbinder
would not release Mr. Natanzon from $350,000 worth of obligations and
that repayment for these debts would begin on January 1, 2003.  (MOU ¶
11).

[5] Additionally, Baron, acting as ERN's agent, was authorized to
sell the Concord and CPS portfolio and apply any proceeds to this $2
million sale.  (Rider ¶ 6).

to Amit Natanzon[.]" (MOU ¶ 15; Rider ¶7.4).  To verify this
provision, a copy of ERN's check register, certified as true and
correct by Mr. Natanzon, was to be delivered to Baron's counsel
every Friday.  Id.

The agreement also provided for a $10 million payment to be
made by ERN to Baron by July 31, 2005.  (MOU ¶ 5).  If such
payment was not timely made, all of ERN's net income was to be
paid to Baron and ERN was to sell any credit card income stream
portfolio with profits going to Baron.  Id.  In any event, the
$10 million was to be paid in full by July 31, 2007.  Id.  During
the pendency of this payment, compensation to Mr. Natanzon and
his family members was to "be limited to total direct and
indirect compensation of $550,000 per year plus a salary to Amit
Natanzon of not more than $50,000 plus commissions."  (MOU ¶ 6).

In addition to a ban on insider distributions and the
limiting of compensation to the extended Natanzon family,[6] the
settlement contained two other provisions which factor heavily
into the motions currently before the court.  First, according to
the Rider, until all obligations detailed in the settlement
agreement were satisfied, Mr. Natanzon convenanted and agreed to
"operate ERN in the ordinary course of business and use his best
efforts to maximize the profitability of ERN."  (Rider ¶ 4).

---

[6] Mr. Natanzon's wife (Tova), elder son (Amit), daughter (Vered
Natanzon Taylor), and son-in-law (Martin Taylor) all worked with ERN
in some capacity as did Harold Taylor, the father of Mr. Natanzon's
son-in-law.

4

Second, the MOU provided that Mr. Natanzon "shall diligently prosecute any and all patent applications and they shall be assigned to ERN, LLC." (MOU ¶ 14).

In and around April 2003, Mr. Natanzon and at least two of his family members formed four new companies that provided similar services to those provided by ERN: MAP, LLC ("MAP"); Nationwide Check Services, LLC; Nationwide Credit Card Center, LLC; and Nationwide Equipment Sales, LLC. (Paper no. 129, Exhibit 5). ERN filed for bankruptcy on April 28, 2004. Id. After a hearing on May 21, 2004 in the United States Bankruptcy Court for the District of Maryland before the Honorable James F. Schneider ("Judge Schneider"), Lawrence D. Coppel, Esq. ("Mr. Coppel" or "trustee") was appointed ERN's Chapter 11 Trustee on May 24, 2004. (Paper no. 129, Exhibit 39 and Exhibit 41). On July 9, 2004, Judge Schneider entered an Order accepting Mr. Coppel's recommendation that the sale of ERN's assets free and clear of liens, claims, encumbrances, and other interests[7] be made to "Rony Natanzon or his designee ("Acquisition LLC")," one of the three bidders in the sale. (Paper no. 110, Exhibit F; Paper no. 129, Exhibit 41). This Court approved the bankruptcy sale on July 20, 2004. See In re ERN, LLC, No. 04-2111 (D.Md. July 20, 2004) (unpublished order affirming bankruptcy court)

---

[7] The only exceptions were the secured debts of David M. Rombro and Antwerpen Motor Cars, Ltd., which were to be assumed by Acquisition LLC. (Paper no. 110, Exhibit F).

(Garbis, J.), <u>appeal dismissed as moot by</u> <u>In re ERN, LLC</u>, No. 04-1834, No. 04-1951 (4th Cir. Jan. 31, 2005) (unpublished <u>per curiam</u> opinion).

## II   Analysis

Plaintiff's Count I Breach of Contract claim is the primary focus of defendants' motion for summary judgment.  Defendants argue that both the "best efforts" and patent applications provision of the settlement agreement are too vague to be enforced.  They further contend that Baron's Count I claims were not ripe when filed, that Baron lacks standing to assert claims regarding improper insider payments, and that the claim related to transfers from ERN to ERN Israel, LLC ("ERN Israel")[8] is barred by the ERN bankruptcy sale Order.  As to Counts III and IV, defendants argue that Mr. Natanzon's co-defendants cannot be held liable for intentional interference with contractual rights in the absence of his material breach of the settlement agreement and because several of them allegedly had no prior knowledge of the agreement's terms.  Finally, defendants maintain that there was no fraudulent conveyance of ERN's assets to ERN Acquisition, LLC ("Acquisition").

In its own motion for summary judgment on Count I, plaintiff

---

[8] As its name indicates, ERN Israel is an Israeli company in which the Natanzon family is involved and which provided the same services as ERN but with a particular emphasis on software development.  (Paper no. 124, Ex. 7, 48-49).  According to Mr. Natanzon's May 17, 2004 deposition testimony, as of that time, his wife, Tova, was the 100% owner of ERN Israel.  <u>Id.</u> at 9-10.

counters that both the "best efforts" and patent application
provisions are enforceable and were violated by Mr. Natanzon.
Additionally, Baron maintains that its breach of contract claims
were ripe when filed, that it has standing to prosecute a claim
for wrongful insider payments, and that its claim regarding
transfers to ERN Israel are not barred by the bankruptcy sale
Order.  In response to defendants' motion for summary judgment on
Counts III and IV, plaintiff argues that breach of contract is
not an essential element of intentional interference with
contractual relations, and because there is evidence that
defendants had knowledge of the settlement agreement, they are
not entitled to summary judgment.  Lastly, plaintiff also
contends that there is no entitlement to summary judgment on
Count X as material facts establish that there was a fraudulent
transfer by Mr. Natanzon to ERN Acquisition of his right to
purchase ERN's assets, thereby rendering Acquisition a fraudulent
transferee.

After a brief consideration of the standard of review for
requests for summary judgment, the Court will address these
various arguments in turn.  As the parties have done in their
motions, the Court will center much of its discussion on the
"best efforts" provision of the settlement agreement.

**A.   Standard of Review**

A moving party is entitled to summary judgment as a matter

of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[.]" Fed. R. Civ. P. 56(c).  Thus, summary judgment is appropriate when it is clear that no genuine issue of material fact remains unresolved and an inquiry into the facts is unnecessary to clarify the application of the law.  Haavistola v. Community Fire Co. of Rising Sun, 6 F.3d 211, 214 (4th Cir. 1993).

The moving party bears the burden of showing "the absence of a genuine issue as to any material fact."  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  The burden then shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When the nonmoving party fails to make such a showing, summary judgment is appropriate because the nonmoving party would be unable to establish an element of its claim at trial.  Id.

To survive summary judgment, the nonmoving party must produce "specific facts showing that there is a genuine issue for trial," and may not rest upon the "bald assertions of [its] pleadings."  FED. R. CIV. P. 56(e).  See also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586

8

(1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts") (citations omitted).  Summary judgment may not be entered where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986).

A court must view the evidence and the reasonable inferences drawn from that evidence "in the light most favorable to the party opposing the motion." Mayor & City of Baltimore v. CSK Transportation, Inc., 404 F.Supp. 2d 869, 871 (D.Md. 2005) (quoting Matsushita, 475 U.S. at 587).  Moreover, a court must bear in mind that its role is not to "weigh the evidence and determine the truth of the matter" but to determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be resolved in favor of either party." Anderson, 477 U.S. at 249-250.  Accord CSK Transportation, Inc., 404 at 871.  The Supreme Court has indicated that, in addition to the weighing of evidence, credibility determinations and "the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" Anderson, 477 U.S. at 255.

When faced with cross-motions for summary judgment, as here, a court "must consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a

matter of law." <u>Sensormatic Security Corp. v. Sensormatic
Electronics Corp.</u>, 455 F.Supp.2d 399, 410 (D.Md. 2006) (citing
<u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003))
(internal quotation marks omitted).

###### B.   Count I: Alleged Breach of Contract by Rony Natanzon

The Court will first discuss the enforceability of the "best
efforts" provision and the evidence regarding Mr. Natanzon's
compliance with that provision and then address the remaining
Count I arguments including ripeness, the patent application
provision, and standing.

###### i.   Enforceability of the "Best Efforts" Provision

As already indicated, the parties hold opposing views on the
enforceability of the "best efforts" provision of the settlement
agreement entered into by Mr. Natanzon on behalf of himself and
ERN, LLC and Mr. Buchbinder on behalf of himself and Baron.  The
language of the Rider indicated that Mr. Natanzon agreed to "use
his best efforts to maximize the profitability of ERN."  (Rider ¶
4).  Citing <u>Brehm v. Sperry et al.</u>, 92 Md. 378, 48 A. 369 (Md.
1901), he now argues that such contractual language is too vague
to be enforced as it contains no "articulated standard" against
which to measure the reasonableness or diligence of his actions.
However, should the Court determine that the provision is
enforceable, Mr. Natanzon maintains that a genuine factual

dispute exists regarding whether he utilized his best efforts to maximize the company's profitability.[9]  For its part, Baron relies on two recent cases decided in Maryland's Court of Special Appeals, First Union National Bank v. Steele Software Systems, Corp., 838 A.2d 404 (Md. App. 2003), and 8621 Limited Partnership v. LDG, Inc., 900 A.2d 259 (Md. App. 2006), to support its position that the "best efforts" provision is not overly vague and enforceable.  It then goes on to detail the many ways in which Mr. Natanzon allegedly failed to "operate ERN in the ordinary course of business and use his best efforts to maximize [its] profitability[.]"

The Court concludes, based in large part on First Union, 838 A.2d 404, that current Maryland law does not require contracting parties to define "best efforts" provisions or state articulated standards against which a promisor's performance may be measured

_____

[9] In defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment on Count I of the Second Amended Complaint, Mr. Natanzon also argues that Baron's motion for summary judgment should be denied because ERN was already insolvent in July 2002 when the settlement agreement was executed.  Therefore, he believes that plaintiff will be unable to show that defendant's conduct (or alleged failure to engage best efforts), as opposed to ERN's pre-existing and continued financial difficulties, was the cause of any loss Baron may have suffered.  The Court does not find ERN's financial state to be a critical element in the determination of the enforceability of and compliance with the "best efforts" provision.  The possibility of breach must be addressed before any damages are assessed.  Moreover, the Court notes that, even where there is no proof of actual damages for a breach of contract, Maryland case law provides for a presumption of at least nominal damages when a party proves a legal wrong.  8 M.L.E. Damages § 81 (updated Dec. 2006).  See also MPJI-Cv 10:10 (a "party to a contract which has been broken may recover nominal damages of $1.00 even though he fails to prove that he suffered actual damages").

in order to uphold and enforce such contractual clauses.  The
term itself is a standard that encompasses good faith and
diligence, and a promisor's compliance will very much depend on
the circumstances surrounding the case in question.[10]

The Court agrees with Baron's view that Brehm, 48 A. 368, is
neither controlling nor a clear indicator that the Maryland
courts find "best efforts" provisions unenforceable in all
instances.  In Brehm, Mr. George Brehm ("Mr. Brehm") wanted
defendants to help him consolidate his brewery with other beer
producers in order to create the "Maryland Brewing Company of
Baltimore City" and to increase its total annual output.  Id. at
368-369.  Defendants contractually agreed to use their "best
efforts" to secure corporations and individuals to enter into
this venture.  Id.  Were they successful, Mr. Brehm's own
contractual obligations would then be triggered as would
additional obligations of the defendants.  Id. at 372-373.
Apparently, despite the fact that defendants were unable to find
willing participants to form a consolidated brewing company, Mr.
Brehm undertook his contractual duties and then sued for specific

---

[10] Although the parties briefly raise the issue of parol evidence
and its relationship to the "best efforts" provision of the settlement
agreement, it is the Court's understanding that neither party is
attempting to introduce testimony regarding contract formation and
what the parties meant by the term "best efforts" when they entered
into the settlement agreement. Moreover, the Court observes that
"[c]ontracts in Maryland are subject to the law of objective
interpretation," meaning that the language of a written agreement is
controlling rather than the parties' intent.  First Union, 838 A.2d at
447 (citations omitted).

performance over a year after the date of completion called for by the contract.  <u>Id.</u>

Not only did the Court of Appeals find defendants' defense of laches to be meritorious, <u>id.</u> at 373, but it also wrote the following about the "best efforts" provision:

> The contract in question is not, in its entirety, such a one as the appellant could have had specific performance of upon an application for that form of relief.  It is not a mere contract of sale on one side, and a purchase on the other, certain and definite in its terms.  It is not a contract to do any certain and definite thing at all events by either party to it.  On the part of [defendants], it is simply a contract "to give their best efforts" to bring about the consummation of a scheme outlined therein.  If they used their best efforts to put the scheme into operation, it is all they could be called upon to do; and a failure to succeed in carrying out the contract, or any particular stipulation in it, would have given the appellant no cause of action against them of any kind.  On the other hand, he was under no obligation to do any of the things agreed to on his part, unless they succeed in their efforts.  Obviously, therefore, the contract was not of a nature to be specifically enforced in its entirety against the other parties to it on the application of the appellant.

Id. at 372.  While the Court of Appeals questionably observed that contractual "best efforts" clauses lack the clarity of arguably more straightforward contracts for the sale of goods, the undersigned does not interpret this passage as standing for the proposition that such provisions are so vague as to defeat enforcement.  Carefully read, <u>Brehm</u> stands for two principles, neither inconsistent with the enforceability of the "best

efforts" provision here.  First, specific performance may not be
awarded for the breach of a "best efforts" agreement.[11]  Second,
if a promisor agrees to and in fact does put forth his best
efforts to achieve some contractual goal, he cannot be held
liable for failing to reach that goal.[12]  This comports with more
modern cases that have concluded that a promise to engage one's
"best efforts" "does not mean that a party must be successful in
performance.  If the performing party does the best he can, the

---

[11] While Brehm has not been expressly overrruled, a search on both
Lexis and Westlaw reveals that this 100-year-old decision has only
been cited five times and not since 1926.  Moreover, in only one of
those instances was Brehm cited for its discussion of "best efforts."
See Feenaughty v. Beale, 178 P. 600, 604 (Or. 1919) ("In [Brehm], a
contract 'to give their best efforts' to the consummation of a certain
scheme was likewise held to be too indefinite for enforcement by
decree.").  As in Brehm, the Feenaughty plaintiffs were requesting
specific performance.  See id. ("In a suit for specific performance,
the contract itself must be specific enough to serve as the foundation
of a specific decree."). A reward of specific performance is generally
considered an extraordinary remedy, especially outside of the context
of contracts for sale of land.  See Cattail Assoc., Inc. v. Sass, 907
A.2d 828 (Md. App. 2006) ("Specific performance is considered an
extraordinary equitable remedy which may be granted, in the discretion
of the chancellor, where more traditional remedies, such as damages,
are either unavailable or inadequate.") (quoting Archway Motors, Inc.
v. Herman, 378 A.2d 720, 724 (Md. App. 1977)); 20 M.L.E. Specific
Performance § 1 (updated Dec. 2006) ("Although specific performance is
an extraordinary remedy, it is as much a matter of course for an
equity court to decree specific performance of a contract as it is for
a court of law to award damages for its breach, although the remedy
has been described as an 'extreme medicine' of the law.") (citations
omitted).  See also 81A C.J.S. Specific Performance § 1 (updated Feb.
2007) ("Specific performance is an extraordinary equitable remedy
which may be sought to compel the performance of a contract on the
terms agreed on, provided that the plaintiff has no adequate remedy at
law for breach of contract.").

[12] The Court notes its agreement with plaintiff that Mr. Brehm
seemingly did not include the breach of the "best efforts" provision
in his allegations.  See Brehm, 48 A. at 373-374 ("essential facts
ought to be made to appear in pleading by direct averment, and not by
inference").

other party has received the benefit of the bargain."  H. Hunger,
Modern Law of Contracts § 8.10 (updated May 2006) (citing
McConnell Douglas Corp. v. U.S., 37 Fed. Cl. 295 (1997)).[13]
Accordingly, Brehm provides little guidance on the question of
the enforceability of the "best efforts" provision in this suit
for damages.

Rather, two recent Court of Special Appeals opinions by
Judge Adkins, First Union, 838 A.2d 404,[14] and 8621, 900 A.2d
259,[15] provide the current view of the Maryland courts regarding
"best efforts" contractual terms.  In First Union, First Union
National Bank ("First Union" or "bank") entered into an agreement
with Steele Software Systems ("Steele") to use its "best efforts
to direct" home equity loan transactions to Steele.  First Union,
838 A.2d at 417.  Although "best efforts" was nowhere defined
within the contract, another provision provided that at least
1,000 of these transactions would be guaranteed per calendar
month.  Id.  The Court of Special Appeals, however, in upholding
a damages award based on the jury's findings as to what

_____

[13]See also Western Geophysical Co. of America, Inc. v. Bolt
Assoc., Inc., 584 F.2d 1164, 1171-72 (2d Cir. 1978) (finding level of
discretion in "best efforts" and no breach of clause where promisor
encountered great difficulties in carrying out terms of contract);
NCNB National Bank of North Carolina v. Bridgewater Steam Power Co.,
740 F.Supp. 1140, 1152 (W.D.N.C. 1990) (finding that a promisee's
disappointment with the results of a promisor's best efforts to secure
financing should not bar that promisor from receiving its agreed upon
fees).

[14] Cert. denied, 380 Md. 619, 846 A.2d 402 (Md. 2004).

[15] Cert. denied, 394 Md. 380, 906 A.2d 943 (Md. 2006).

percentage of First Union's total loan transactions amounted to
the bank's best efforts, made quite clear that it found the "best
efforts" provision not only enforceable but also separate from
the provision dealing with minimum volume.  As Judge Adkins wrote
for the Court:

> We are not saying as a contractual matter, the
> "best efforts" clause had no meaning, and that the
> only enforceable promise by First Union was the
> Minimum Volume. . . . [W]e think, in assessing
> [Steele's] contract claim, the jury could have
> decided that the best efforts clause imposed some
> requirement on First Union to diligently refer a
> significant amount of business to [Steele], even
> if it did not require First Union to refer a
> specifically agreed upon percentage of its
> business.

Id. at 433.  Later in his opinion, Judge Adkins expressly states
that even where a "best efforts" term is not "clearly defined,"
it "is a standard that has diligence as its essence,"[16] and is a
term that "takes its meaning from the circumstances."[17]  Id. at
448.  In other words, "best efforts" is a standard in and of
itself, and therefore, is enforceable.[18]  Id. ("best efforts not

---

[16] Citing E. Allan Farnsworth, On Trying to Keep One's Promises:
The Duty of Best Efforts in Contract, 46 U. PITT. L. REV. 1, 8 (Fall
1984).

[17] Citing Bloor v. Falstaff Brewing Corp., 454 F.Supp. 258, 266
(S.D.N.Y. 1978), aff'd by Bloor v. Falstaff Brewing Corp., 601 F.2d
609 (2d Cir. 1979) (Friendly, J.).

[18] Having reached this conclusion, the Court observes that two of
the sources cited by defendants do not further their position.  First,
defendants quote Maslow v. Vanguri, 896 A.2d 408, 422 (Md. App. 2006)
for the general proposition that, "[w]hether oral or written, a
contract is not enforceable unless it expresses with definiteness and
certainty the nature and extent of the parties' obligations and the
essential terms of the agreement."  As opposed to other possible

too vague to be enforceable"). This reading of the decision is consistent with the cases[19] and commentators upon which the <u>First Union</u> opinion relies for its conclusion.[20] It is also consistent with Judges Adkins' opinion in <u>8621</u> where he extended this "best efforts" analysis to approve other types of "open terms" in

---

contractual language, "best efforts" provisions <u>are</u> a definite, enforceable standard, and therefore, the parties in this case can be said to have expressed with adequate clarity the obligations created by and the terms of the settlement agreement. Second, defendants cite comment a to the RESTATEMENT (SECOND) OF AGENCY § 449 (1957) which declares that, "[i]n the ordinary listing of property with a real estate broker, the broker's promises to use his best efforts or other similarly indefinite promises are not, without other facts, sufficient to indicate that consideration has been given." One may simply interpret this comment as standing for the widely accepted proposition, discussed below, that a "best efforts" evaluation will require an analysis of the circumstances surrounding a given case.

[19] The cases cited in <u>First Union</u> upheld "best efforts" clauses that were unaccompanied by a separate articulated standard or specific definition elsewhere within the contracts in questions. <u>See</u> <u>Mor-Cor Packaging</u>, 328 F.3d at 334 (7th Cir. 2003) (Posner, J.) (labeling "best efforts" a "standard" in and of itself and enforcing contractual requirement for promisor to use his best efforts to sell promisee's product); <u>NCNB</u>, 740 F.Supp. at 1144 (promise to use best efforts to help steam power company achieve its financial objectives); <u>Western Geophysical</u> 584 F.2d at 1167 (promise "to use [] best efforts to promote worldwide licensing and use" of promisee's air gun device); <u>Bloor</u>, 601 F.2d at 610 (affirming lower court's enforcement of contractual provision in which promisor agreed to use best efforts to promote and maintain a high volume of promisee's products); <u>CKB & Assoc., Inc. v. Moore McCormack Petroleum, Inc.</u>, 809 S.W. 2d 577, 581-582 (Tex.App. 1991) (despite lack of definition for "best efforts," finding that promisor failed to use best efforts to produce volumes of crude oil specified in contract).

[20] <u>See</u> E. Farnsworth, <u>Farnsworth on Contracts</u> § 7.17c (2d ed. 2001) (no longer the case that "a duty defined only in terms of best efforts" is too indefinite to be enforceable) (citations omitted); K. Adams, <u>Understanding "Best Efforts" and Its Variants (Including Drafting Recommendations</u>, 50 No. 4 PRACTICAL LAWYER, 17 (Aug. 2004) [hereinafter "Adams"] ("Courts in most jurisdictions have held that efforts provisions are enforceable."); Farnsworth, <u>On Trying to Keep One's Promises)</u>, 46 U. PITT. L. REV. at 12("Whatever the test of best efforts, there is no question but that courts today regard the standard of best efforts - like that of good faith - as a workable standard in a wide variety of situations for determining whether or not there has been a breach.").

contracts.  8621, 900 A.2d at 267 ("There are many types of

enforceable commercial contracts that deliberately select an

'open' term of performance such as those that require the parties

to use 'best efforts,' 'good faith,' or 'reasonable efforts.'")

(citing First Union, 838 A.2d at 448; K. Adams, Understanding

"Best Efforts" and Its Variants (Including Drafting

Recommendations), 50 No. 4 PRACTICAL LAWYER (Aug. 2004)).

Accordingly, the Court disagrees with defendants' reading of

Brehm, First Union and 8621.  Brehm does not deny the

enforceability of a best efforts clause.  First Union and 8621

affirmatively establish its enforceability.

The Court further finds the out-of-state authorities that

defendants assert as support for their position unpersuasive as

not controlling, representing a minority view, or not supporting

defendants' view of the law.[21]

---

[21] Commentator Kenneth Adams has indicated that the primary
exception to the majority rule of enforceability of "best efforts"
provisions "is Illinois courts, which have held that a promise to use
best efforts is too vague to be binding if the parties fail to
indicate what performance the phrase requires."  Adams at 17.  As an
example, Mr. Adams cites Kraftco Corp. v. Kolbus, 274 N.E. 2d 153, 156
(Ill. App. Ct. 1971), also cited by defendants.  (Paper no. 110, 10).
The other exception appears to be those New York courts that have
required something akin to "a clear set of guidelines against which to
measure a party's best efforts" in order for a "best efforts"
provision to be enforced.  See Adams at 17.  However, according to Mr.
Adams, most of these cases, such as Pinnacle Books, Inc. v. Harlequin
Enterprises, Ltd., 519 F.Supp. 118, 121-122 (S.D.N.Y. 1981), do not
"address enforceability of an agreement to use efforts to accomplish a
contract goal."  Adams at 17 (emphasis added).  In Pinnacle Books, a
case cited by defendants, the district court appropriately
distinguished between an agreement to use "best efforts" to "work
toward a specific goal" and an agreement to use "best efforts" only to
negotiate a contract and noted that the "very nature of contact
negotiations renders it impossible to determine whether the parties

Having established that contractual "best efforts" terms are enforceable under Maryland law, even when parties to a contract have chosen not to define those terms or expressly provide a standard by which to measure a promisor's performance, the Court must determine what further guidance the fact-finder can be given in evaluating a lack of "best efforts" contractual claim and whether such a claim can be resolved on summary judgment.  As already alluded to, Professor Farnsworth, whose commentary on "best efforts" provisions is frequently cited, equates the "best efforts" standard with "diligence," and thereby differentiates it from good faith, a standard with "honesty and fairness at its core" that is read into every contract.  <u>See</u> E. Farnsworth,

---

have used their 'best' efforts to reach a new agreement." <u>Pinnacle Books</u>,519 F.Supp. at 121-122.  The contractual term at issue here entails a specific goal, and therefore, this matter is readily distinguishable from <u>Pinnacle Books</u>.

In addition to <u>Pinnacle Books</u>, defendants have cited two New York State cases which likewise do not advance their position.  First, <u>Timberline Development, LLC v. Kronman</u>, 263 A.D.2d 175 (N.Y. App. Div. 2000), does not clearly stand for the proposition that objective criteria are always required to uphold a "reasonable efforts" provision.  <u>Id.</u> at 178 ("The requirement to employ reasonable efforts or 'best efforts', as it is generally expressed, in the performance of contractual obligations is deemed to be implicit in every agreement.") (citing <u>Wood v. Lucy, Lady Duff-Gordon</u>, 222 N.Y. 88, 92 (N.Y. 1917)).  Second, while defendants are correct that <u>Strauss Paper Co., Inc. v. RSA Executive Search, Inc.</u>, 260 A.D.2d 570 (N.Y. App. Div. 1999), explicitly stands for the proposition that, to be enforced, a contractual clause must contain "clear guidelines against which to measure ["best efforts"]," other New York courts have rejected such a requirement.  <u>See Ashokan Water Services, Inc. v. New Start, LLC</u>, 807 N.Y.S.2d 550 (2006) (N.Y. Civ. Ct. 2006) (observing that numerous courts, including New York Courts, "have applied an express 'best efforts' provision without articulated objective criteria, or implied one where it was not expressed") (citations omitted).  In any event, this Court is necessarily guided by Maryland, not Illinois or New York, law.

Farnsworth on Contracts § 7.17c (2d ed. 2001) (citations omitted).  While it is a separate and more exacting standard than good faith,[22] Professor Farnsworth stresses that the "best efforts" standard "presumably falls short of the standard required of a fiduciary, who is required to act primarily for the benefit of another in matters connected with his undertaking." Id. (citations and internal quotation marks omitted).  Indeed, courts recognize that a "promise to use best efforts does not require that a party disregard its own interests." First Union, 838 A.2d at 431 (citing NCNB, 740 F.Supp. at 1152).  See also Triple-A Baseball Club Assoc. v. Northeastern Baseball, Inc., 832 F.2d 214, 228 (1st Cir. 1987) (rejecting concept that "best efforts" requires promisor to make "every conceivable effort"); Bloor, 601 F.2d at 614 (commenting that promisor not obligated to "spend itself into bankruptcy" in expending "best efforts" to promote promisee's product).  Cf. Informed Physician Services,

---

[22] Although "best efforts" is a standard separate from that of the ever present "good faith," good faith may be a factor in determining whether a party has complied with its "best efforts" obligations.  See 17B C.J.S. Contracts § 561 ("Where the manner of performance is left to the discretion of one of the parties to a contract, that party is bound to exercise good faith in performing his or her duties under the contract.  Good faith is also a factor in the determination of whether or not a party has fulfilled his obligations under a best-efforts clause, since to prevail on a contention that the promisor has failed to use best efforts to carry out a contract, the promisee may be required to show that the nature and extent of the promisor's efforts did not reflect good-faith business judgments.") (citing Olympia Hotels Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1366 & 1373 (7th Cir. 1990) (Posner, J.) (finding that "[t]he term 'best efforts' is a familiar one in contract parlance" and where promisor had similar contracts with other promisees to make hotels a success, contractual "best efforts" provision meant such efforts as the promisor had made in other contracts where adequacy of its efforts unquestioned); NCNB, 740 F.Supp. 1130).

Inc. v. Blue Cross and Blue Shield of Maryland, Inc., 711 A.2d
1330, 1343 (Md. 1997).  ("Although 'standing idly by' and falling
on one's sword does not constitute the requisite reasonable
effort, a party is not required to pursue baseless and expensive
litigation or incur extraordinary expense simply to establish
reasonableness or good faith.").

Undertaking one's "best efforts" to achieve a contractual
goal has been described in terms of reasonableness.  For example,
in First Union, Judge Adkins explained that the jury was not
basing its damages assessment on a specific percentage of
referrals but rather on an after-the-fact determination of "what
level of business [referred to Steele] would have resulted from
reasonably diligent efforts."  First Union, 838 A.2d at 450
(emphasis added).  See also Coady Corp. v. Toyota Motor
Distributors, Inc., 361 F.3d 50, 59 (1st Cir. 2004) ("'Best
efforts' is implicitly qualified by a reasonableness test – it
cannot mean everything possible under the sun") (citing Macksey
v. Egan, 633 N.E.2d 408, 413 & n.16 (Mass. App. Ct. 1994)); Mark
P. Gergen, The Use of Open Terms in Contract, 92 COLUMBIA L. REV.
997, 1000 (1992) ("Best efforts clauses and other terms that
require a party to use reasonable prudence in performance are
obviously like a negligence rule.") (quoted by 8621, 900 A.2d at
267).  Once again, Professor Farnsworth's commentary is useful.
As he describes it, courts have crafted two possible bases for a
standard of best efforts: "[t]he first is to imagine a reasonable
third person . . . in the promisor's place and to ask what

efforts such a person would exert.  The second is to imagine the promisor and the promisee to be united in a single entity and to ask what efforts such an entity would exert on its own behalf." Farnsworth on Contracts § 7.17c.

Reasonableness or the actions of a reasonable person are, of course, highly dependent on the surrounding circumstances, and a "best efforts" assessment will similarly be heavily dependent on the particular facts and circumstances of the case in question. See, e.g., Trimed, Inc. V. Sherwood Medical Co., 772 F.Supp. 879, 885 (D. Md. 1991) (citations omitted); NCNB, 740 F.Supp. at 1151 (citations omitted); Triple-A Baseball Club Assoc. v. Northeastern Baseball, Inc., 832 F.2d 214, 225 (1st Cir. 1987) (what constitutes "best efforts" "varies with the facts and the field of law involved"); First Union, 838 A.2d at 448 (citing Bloor, 454 F.Supp. at 266).  In evaluating compliance with a "best efforts" contractual provision, consideration may be given to a "party's experience, expertise, financial status, opportunities, and other abilities" as well as the goals of both parties.  See NCNB, 740 F.Supp. at 1151-52 (noting that courts have found breach of "best efforts" terms "when one party has ceased performance altogether and when a party has engaged in numerous misfeasances or nonfeasances").  See also Adams at 20 ("determining the benchmark for sufficient effort may include: [1] promises made during contract negotiation; [2] industry practice; [3] practice with respect to other contacts; and [4] how the promisor would have acted if the promisor and promisee

had been the same entity").  Given that a "best efforts" assessment is generally a matter of fact and not law, the finder of fact will be in the "best position" to determine the sufficiency of a promisor's efforts.  See Trimed, 772 F.Supp. at 885; Mor-Cor Packaging, 328 F.3d at 334 (whether compliance with a "best efforts" provision is a question of fact as it involves "the application of a standard . . . to the particular circumstances of the case") (citations omitted); First Union, 838 A.2d at 428 ("although contract interpretation is generally a question of law, a factual determination may be required as to what is deemed 'best efforts'") (citations omitted).  Cf. Informed Physician Services, 711 A.2d at 1342 (what constitutes reasonable efforts under a contract largely a question of fact) (citation omitted).

Turning to the case sub judice and the contractual agreement at the heart of Count I, the Court holds that the "best efforts" provision contained therein is enforceable.  Although "best efforts" was not expressly defined by the parties, Maryland law supports such a standard.  Additionally, the provision was accompanied by an articulated goal, i.e. "maximiz[ing] the profitability of ERN."  (Rider ¶ 4).  As such, it is possible to evaluate Mr. Natanzon's compliance with the provision by delving into the circumstances of this case.  See First Union, 838 A.2d 404, 417 and 433 (upholding "best efforts" provision with stated goal of directing loan transactions to promisee and recognizing that term takes its meaning from the circumstances) (citations

23

omitted).  <u>See also</u> <u>NCNB</u>, 740 F.Supp. at 1152 (even absent a definition or articulated standard, a party's "best efforts" can be determined from circumstances based on the goals of both parties); <u>Trimed</u>, 772 F.Supp. at 885 (determination of what constituted promisor's "best efforts" to sell promisee's products dependent upon circumstances of the case) (citations omitted). <u>Cf.</u> <u>8621</u>, 900 A.2d at 270 (upholding "reasonable efforts" contractual term that had "agreed-upon objective" as in <u>First Union</u>).  However, whether this evaluation can be decided as a matter of law on the record before the Court remains to be considered.[23]

The Court finds that it is undisputed that Mr. Natanzon breached specific provisions of the settlement agreement.  For example, it is undisputed that (1) he did not certify ERN's check register as true and correct and deliver a copy to plaintiff's counsel each Friday as required by the settlement agreement, (MOU ¶ 15; Rider ¶ 2); and (2) he did not inform Baron that its perfected security interest in the Concord and CPS portfolio had been affected.  (Rider ¶ 12).  In addition, there is ample

---

[23]  <u>Cf.</u> <u>Informed Physician Services</u>, 711 A.2d at 1342, in which the Court of Appeals wrote:

> Because the issue [of reasonable efforts] is largely a factual one, most cases in which it has arisen have reached the appellate courts after a full trial, and where material facts, or inferences from them, are in dispute, summary judgment would be inappropriate. Nonetheless, like most other legal issues that are fact-dependent, summary judgment is permissible on this issue if the relevant evidence before the court is not in substantial dispute and allows a conclusion to be drawn as a matter of law.

<u>Id.</u> (citations omitted).

evidence that Mr. Natanzon did not operate ERN in the ordinary course of business, based on the following and other undisputed facts: (1) there were no written loan agreements for any loans purportedly made by Mr. Natanzon to ERN;[24] (2) funds from the ACH merchant account were sometimes used to reimburse Mr. Natanzon for short-term loans he purportedly made to ERN;[25] (3) ERN supplied at least some of the funds used to pay Mr. Natanzon's $350,000 personal obligation to Mr. Buchbinder which was required by Paragraph 11 of the MOU;[26] (4) other than ledger entries, there were no written agreements between ERN and MAP regarding monies owed between the two companies;[27] (5) neither Mr. Natanzon nor Martin Taylor knew exactly how much it cost ERN to provide MAP with services such as those related to accounting, payroll, processing, data entry, or customer service;[28] (6) ERN fell behind in payments due to merchants from the ACH funds and did not notify merchants of this fact;[29] and (7) other than a possible 25% management fee, the so-called BTF portfolio was transferred from ERN to MAP for no consideration.[30]

Although it is undisputed that Mr. Natanzon violated the

---

[24] (Paper no. 125, Ex. 2, 178 & 190).

[25] Id. at 178-179.

[26] (Paper no. 125, Ex. 1, 93-95; Ex. 7, 65).

[27] (Paper no. 125, Ex. 7, 64-65).

[28] (Paper no. 125, Ex. 7, 61-63; Ex. 10, 81).

[29] (Paper no. 125, Ex. 2, 164; Ex. 7, 18-20).

[30] (Paper no. 125, Ex. 1, 190-193; Ex. 8, 193-196, 200).

settlement agreement and took actions inconsistent with operation of ERN in the ordinary course of business, neither case law nor logic necessarily equate a failure to operate a business in the ordinary course generally, or as required by Paragraph 4 of the Rider, with a failure of "best efforts."  These failures to operate ERN in the ordinary course of business and to comply with specific provisions of the settlement agreement certainly bear on the question of "best efforts," but they do not definitively answer the question under any of the authorities cited.  Having said that, the Court is troubled that a party that used ERN funds to pay personal financial obligations and that used ACH merchant fees to reimburse himself for loans purportedly made to the company could ever be said to be using his "best efforts to maximize the profitability of ERN."  The Court welcomes further authorities and argument on this point as the litigation progresses.  However, at this point and in the absence of further authorities, the undersigned is not prepared to hold as a matter of law, that Mr. Natanzon failed to use "best efforts to maximize the profitability of ERN."  Accordingly, the question of Mr. Natanzon's compliance with the "best efforts" provision appears to be a question for the jury in the upcoming trial.

While there are some facts not in dispute, as discussed above, there are material disputes of other facts.  Moreover, there are differing expert opinions on certain of Mr. Natanzon's actions in managing ERN and whether, in some cases, those actions were justifiably taken to maximize the profitability of the

company rather than to impermissibly benefit Mr. Natanzon, his family and affiliates to the detriment of ERN and its creditors.

Because plaintiff moved for summary judgment on the basis that "Mr. Natanzon breached <u>all</u> of his contractual commitments," (Paper no. 125, 33) (emphasis added), the Court cannot grant its motion.

### ii.  The Ripeness of Baron's "Best Efforts" Claim

Defendants also argue that, even if the settlement agreement's "best efforts" provision is enforceable, it is premature because ERN's $10 million obligation to Baron is not due until July 31, 2007.  As Baron's claim for breach of contract was first brought against Rony Natanzon on January 17, 2004, they maintain plaintiff's suit was not ripe.

Plaintiff counters that Baron's claims are ripe.  First, it argues that, as per the provisions of Section 502 of the Bankruptcy Code, upon ERN's bankruptcy filing, the $10 million from ERN became due and payable.  Baron focuses on the December 15, 2004 filing date of its Second Amended Complaint and points out that by this time, "ERN had already filed [for] bankruptcy and Baron's claims had already been allowed in ERN's bankruptcy."[31]  Second, plaintiff argues that defendants' focus on the July 31, 2007 date is misplaced and ignores Mr. Natanzon's

---

[31] Baron believes that defendants are collaterally estopped from challenging the findings of facts and conclusions of law made by Judge Schneider when he appointed a Chapter 11 bankruptcy trustee.  The possible preclusive effect of Judge Schneider's ruling appointing a Chapter 11 bankruptcy trustee will be addressed below in Section II(B)(vi).

other contractual obligations under the settlement agreement.

The Court agrees with plaintiff that its claim of breach of contract against Rony Natanzon for the alleged failure to comply with the "best efforts" provision is ripe.  By entering into the settlement agreement on July 12, 2002, Mr. Natanzon undertook certain continuing obligations entirely _separate_ from any promise made by ERN to pay Baron $10 million by July 31, 2007.  Among the obligations personally undertaken by Mr. Natanzon, and effective upon the signing of the MOU and Rider by the parties, was a promise to operate ERN in the ordinary course of business and to use his "best efforts" to maximize the company's profitability. If at any time after July 12, 2002, Baron believed Mr. Natanzon had materially breached that provision, there was no reason for delay; it could immediately file a breach of contract claim.

### iii. Patent Application Provision

Defendants next argue that the patent application provision in Paragraph 14 of the MOU is too vague to be enforced because it does not specify exactly which patent applications are to be prosecuted or provide any "objective performance benchmarks[.]" Even if the provision is deemed enforceable, they contend that there are genuine disputes of material fact as to whether Mr. Natanzon's conduct with respect to the ValuePak point-of-sale device was diligent and reasonable.  They suggest that Mr. Natanzon made a cost-benefit analysis based on a variety of facts and determined that pursuing the ValuePak patent would not be

28

fiscally prudent for an already troubled ERN.

Plaintiff responds that the provision is to "diligently prosecute" patent applications.  It alleges that there is evidence that Mr. Natanzon altogether ignored the patent application pending at the time of the settlement agreement and "doing nothing" can simply not be equated with acting diligently.

The Court finds that the patent provision is enforceable: the requirement that Mr. Natanzon "diligently" prosecute any patent applications is comparable to a requirement to use "best efforts" to achieve a certain contractual goal, which the Court has already determined enforceable under Maryland authorities.  Additionally, the patent provision at issue here is not unlike the disputed contractual provision in Western Geophysical Co. v. Bolt Assoc., Inc., 584 F.2d 1164, 1167 (2d Cir. 1978), which required the promisor to undertake its best efforts to promote worldwide licensing and use of an air gun device to sublicensees and governmental and non-profit institutions.  Although the promisor was ultimately unable to sublicense the device, the Second Circuit Court of Appeals found that it had complied with the contractual provision.  Id. at 1171-72.  It ruled that a promise to use "best efforts" encompasses a certain amount of discretion, and no breach of the clause would lie where the promisor had encountered tremendous difficulties in carrying out the terms of the contract.  Id.  The Court of Appeals agreed with the lower court's findings that the promisor had expended time and money unsuccessfully trying to improve the device.  Id. at

1168.  After such attempts, it was within the promisor's discretion to conclude that the device in question "could not successfully compete" with other established air gun devices already available in a "diminishing market."  Id.  Similarly, Mr. Natanzon's efforts to prosecute the patent for the ValuePak device could be found to be diligent even if he ultimately concluded that the current market and competing devices warranted abandoning the patent application he was subsequently to assign to ERN.

Because there are disputed facts regarding Mr. Natanzon's efforts to diligently prosecute the only patent that seems to be at issue, i.e. the ValuePak patent, the Court cannot grant summary judgment for either party on this issue.  Mr. Natanzon's diligence, as with his "best efforts" to maximize ERN's profitability, requires an examination of the circumstances surrounding this case and an assessment of credibility, both of which are an undertaking for the jury.

### iv.  Baron's Standing to Assert Count I Claims[32]

In their motion for summary judgment, defendants argue that plaintiff does not have standing to prosecute three breach of contract claims described in Count I because they can only be prosecuted by ERN's Bankruptcy Trustee:

—  Paragraph 42 of the Second Amended Complaint (operation

---

[32] In its post-hearing submission, the defendants expand their standing argument to Counts III and IV based on the Itemization of Damages submitted by Baron.  As discussed below, the Court rejects this argument as to all counts.

of ERN in the ordinary course and use of best effort to
maximize profitability, as per Rider ¶ 4);

—    Paragraphs 44 and 45 of the Second Amended Complaint
(limitation on payments other than ordinary salaries to
Natanzon and his family members, as per MOU ¶ 15); and

—    Paragraphs 44 and 46 of the Second Amended Complaint
(prohibition of payments on insider debt or any
distribution of any type to any insider, as per MOU ¶
15).

The first claim, defendants posit, is essentially an estate
claim for misconduct, mismanagement or neglect of duty by a
corporate officer or director.  The second and third claims,
defendants further posit, are essentially preference and
fraudulent conveyance claims, belonging to the estate, with the
allegations of improper payments arguably also an estate claim
for misconduct.  These claims, defendants say, are within the
exclusive province of the bankruptcy trustee.

The Court rejects defendants' standing argument for two
related reasons.  First, as plaintiff correctly points out,
"[d]efendants' same argument that Baron lacks standing to sue
defendants for breach of the MOU/Rider settlement agreement was
heard and rejected by this Court in 2004." (Paper no. 139, 1).
On October 6, 2004, plaintiff filed a motion for leave to file an
amended complaint. (Paper no. 34).  That proposed amended

complaint included all the claims that defendants challenge here as belonging to the trustee.  (Id., Ex. 3).  At the time, defendants vigorously opposed leave to amend, raising lack of standing and the specter of the undermining of the ERN bankruptcy proceedings.  (Paper no. 35, 4-7).  Judge Garbis held that "[p]laintiff and the Bankruptcy Trustee have reached an agreement that moots the standing issue.  Plaintiff has agreed to dismiss without prejudice Count II (interference with contractual relations) and to change certain of the other claims to avoid infringing upon the rights of the Trustee.  Plaintiff has, also, agreed not to proceed on claims that are the property of the Estate.  See Stip. Between. Pl. & Coppel (Paper no. 40)."  (Paper no. 42, 3-4).

Moreover, Judge Garbis was dismissive of defendants' claim that this action would "'undermine' the bankruptcy proceedings," noting that the plaintiff and the trustee had entered into an agreement assuring that plaintiff will not proceed on any estate claim and further providing th trustee standing to intervene if he determined in the future that the case interfered with or undermined the bankruptcy proceedings.  (Paper no. 42, 4-5).  Accordingly, this Court has already found that plaintiff has standing to bring the challenged Count I and Count III and IV claims, and defendants are recycling already rejected arguments.  The Court finds that plaintiff's standing to bring Counts I, III

and IV is "law of the case" and will not disturb that ruling at this eleventh hour.[33]

The "law of the case" doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Columbus-American Discovery Group v. Atlantic Mutual Insurance Co., 203 F.3d 291, 304 (4th Cir. 2000) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)); JH ex rel. JD v. Henrico County School Board, 395 F.3d 185, 197, n.9 (4th Cir. 2005) (citation omitted).  While the doctrine is discretionary, not jurisdictionally required, see Columbus-American, 203 F.3d at 304 (citing Smith v. Bounds, 813 F.2d 1299, 1304 (4th Cir. 1987)), "law of the case" applies to those situations where a court refuses to "reconsider its own decision rendered at an earlier stage of the litigation absent clear and convincing reasons to reexamine the prior ruling."  Major v. CSX Transportation, 278 F.Supp. 2d 597, 615, 616 (D.Md. 2003).  See also In re Equimed, Inc., 153 B.R. 391, 396-397 (D.Md. 2000) (concluding that party was precluded by "law of the case" doctrine from presenting at second hearing evidence in support of contention that venue did not exist where evidence at second hearing was not substantially

---

[33] The Court understands that standing is an issue that is subject to review at all stages of the litigation.  However, that legal principle does not defeat application of the law of the case doctrine. Compare Christianson v. Colt Industries Operating Corp., 486 U.S. 800 (1988) (application of law of the case with respect to a question of jurisdiction).

different than that presented at first hearing).  This rule of
practice promotes the finality and efficiency of the judicial
process by protecting against "the agitation of settled issues,"
Christianson v. Colt Industries Operating Corp., 486 U.S. 800,
816 (1988) (quoting 1B J. Moore, J. Lucas, & T. Currier, Moore's
Federal Practice ¶ 0.404[1], p. 118 (1984), as well as "the
burdens of repeated reargument by indefatigable diehards."
Wright, Miller & Cooper, Federal Practice and Procedure:
Jurisdiction 2d § 4478 (2002) [hereinafter FPP] (citation
omitted).

There are no compelling reasons to re-examine this prior
ruling on standing.  Defendants argue that the standing issue
should be revisited in light of developments in the case after
Judge Garbis' ruling in November 2004.  Specifically, defendants
say that Baron's Itemization of Damages in February of this year
demonstrate that "the damages alleged by Baron with respect to
Counts I, III and IV of the Amended Complaint relate to alleged
diversions of assets from ERN." (Paper no. 143, 3).  "Only ERN's
Bankruptcy Trustee," defendants continue, "has standing to pursue
claims to recover assets from ERN." (Id.)  This development is
not significant for purposes of standing.  Plaintiff is not
trying to recover assets diverted from ERN.  Rather, the
Itemization only suggests that the proper measure of damages
suffered by plaintiff by virtue of defendants' alleged wrongful

conduct may be similar to the measure of damages the trustee could recover under traditional estate claims.

There are none of the factors here which suggest a need for review.  There is no new evidence.  There is no intervening change of the law.  Clearly, Judge Garbis' decision on standing does not represent clear error or manifest injustice.  See FPP § 4478 (citations omitted).  Indeed, developments since 2004 demonstrate not only the Bankruptcy Court's acquiescence to Baron's litigation of these claims, but the trustee's embrace of the litigation as in the interest of all of ERN's creditors.

In the Court's November 2004 opinion, Judge Garbis granted the trustee "standing to intervene hereafter to seek dismissal of any claim on the ground that [it] is the property of the Estate." (Paper no. 42, 4).  The trustee has not sought dismissal of any of the claims in the Second Amended Complaint as being the property of the estate.  Rather, Baron and the trustee entered into a sharing agreement as to any recovery from the district court and bankruptcy court proceedings against Mr. Natanzon and related parties.  On May 18, 2006, after notice and a hearing, the Bankruptcy Court here found that the trustee-Baron sharing agreement was "reasonable, appropriate, and in the best interest of the Debtor's Estate."  (Paper no. 138, Ex. 1).  Thus, the earlier ruling of this Court on standing remains.

Second, despite defendants' characterization of National American Insurance Co. v. Ruppert Landscaping Co., 187 F.3d 439

(4th Cir. 1999), as a clear bar to plaintiff's standing, it is not.  As plaintiff suggests, the policy rationale underlying the holding in Ruppert is not compromised by affirming Baron's standing to pursue its breach of contract claims and tort claims.[34]  As the Court understands it, the Fourth Circuit's foremost concern in Ruppert was "maintain[ing] the integrity of the bankruptcy proceeding and ensur[ing] that individual creditors [do not] hijack the bankruptcy process."  Ruppert, 187 F.3d at 442.  Orders issued by Judges Garbis and Schneider indicate that neither those judges nor the trustee are of the view that Baron has subverted the bankruptcy process to the detriment of ERN's other creditors.  In Judge Garbis' opinion, he opined that, contrary to defendants' allegations, the filing of the Second Amended Complaint would not "'undermine' the bankruptcy proceedings.  Indeed, [Baron] and [the trustee] have entered into an agreement that insures that Plaintiff will not be proceeding on any claim belonging to the Estate." (Paper no. 42, 4-5).  More recently, on May 18, 2006, Judge Schneider also approved an agreement between Baron and Mr. Coppel that, in part,

---

[34] The defendants do not seriously argue that the contract claims are part of the bankruptcy estate.  Where a cause of action belongs to an injured creditor, it is that creditor who has standing to bring suit and not the bankruptcy trustee, who may sue only if the debtor corporation itself could have done so.  See, e.g., In re Transcolor Corp., 296 B.R. 367 (Bkrtcy.D.Md. 2003) (Schneider, J.).  ERN has no causes of action based on violations of the provisions of the settlement agreement.  Rather, defendants argue that at least some of the claims are "similar in object and purpose" to bankruptcy estate claims, under Ruppert.  The Court does not disagree that there is some similarity in object and purpose, but for the reasons discussed, it does not find that similarity determinative of standing under the particular facts in this case.

allows for a shared recovery arrangement, as in the best interest of the bankruptcy estate.  (Paper no. 138, Ex. 1).[35]  This situation is vastly different than the factual scenario that the Fourth Circuit Court of Appeals faced in <u>Ruppert</u>.  There the Fourth Circuit reported that: "The bankruptcy court noted that the trustee has a potential fraudulent conveyance action to challenge the legality of the transaction between Ruppert and Green Thumb."  <u>Ruppert</u>, 187 F.3d at 441 (citing 11 U.S.C. § 548).  The Court concluded that:

> It is clear that the trustee should have first crack at challenging the Ruppert/Green Thumb transaction – the trustee's role is to bring suits such as these on behalf of all the creditors."

<u>Id.</u> (citation omitted).

Here, the Trustee does not view the Baron lawsuit as an assault on the creditors' interests or the integrity of the bankruptcy proceedings, but as a positive benefit to the bankruptcy estate.  He does not seek a "first crack" at these various causes of actions.  Rather, he is collaborating with Baron in an attempt to secure the best outcome for all of ERN's creditors.[36]

---

[35] The Court agrees with plaintiff as to the significance of the Bankruptcy Court's May 18, 2006 Order: "it did not establish Baron's standing . . .  The May 18 Order did conclusively dispose of any possible argument that Baron's recovery of damages would adversely affect the estate or harm creditors.  In fact, just the opposite is true."  (Paper no. 139, 3).

[36] This Court rejects defendants' assertion that under <u>Ruppert</u>, the bankruptcy court must formally abandon Baron's contract and tort

It would be an affront to the Bankruptcy Court (as well as nonsensical) for this Court to ignore the carefully crafted and court-approved arrangement designed to protect the interests of the ERN bankruptcy estate and declare Baron's lack of standing in an effort to protect the interests of the bankruptcy estate.  The Court disagrees with defendants that the Bankruptcy Code and Fourth Circuit authority commands a finding of no standing under the circumstances of this case.

> **v.   Bankruptcy Sale Order's Effect on Allegations of Improper Transfers from ERN, LLC to ERN Israel, LLC**

Defendants' next contention is that plaintiff's allegations regarding improper transfers from ERN to ERN Israel are barred by the bankruptcy sale which transferred any claims against ERN Israel or the $1.6 million accounts receivable from that entity to ERN Acquisition, LLC.  A breach of contract claim based on this rationale is, according to defendants, barred for three reasons: (1) it is an impermissible collateral attack on a final sale order of a bankruptcy court; (2) it is barred by judicial estoppel; and (3) the plain language of the sale Order is that

---

claims.  The Court agrees with plaintiff that: "[i]t is axiomatic that a Trustee cannot abandon a cause of action he does not own."  (Paper No. 139, 5).  <u>Ruppert</u> does not stand for the proposition that it is the bankruptcy trustee that owns these other causes of action of individual creditors.  Rather, the Court was protective of the bankruptcy trustee's priority in pursuing its claims for the good of all the creditors, before allowing individual creditor claims which might interfere with the bankruptcy proceedings.  <u>See</u> <u>Ruppert</u>, 187 F.3d at 441-442 (citations omitted).

ERN Acquisition has the right to pursue claims against ERN Israel.

Plaintiff has "acknowledge[d] that ERN's account receivable due from ERN Israel was sold to ERN Acquisition in the bankruptcy sale," (Paper no. 125, 57), but counters that the sale of the ERN Israel account receivable did not extinguish the fact that Mr. Natanzon fraudulently transferred over $1 million to ERN Israel, in violation of his MOU and Rider obligations not to pay insider debt or make distributions of ERN assets and property to insiders, to operate ERN in the ordinary course of business and to use his "best efforts" to maximize the company's profitability.  Baron maintains that the bankruptcy sale of the account receivable is immaterial and irrelevant in light of the breach.

The Court agrees with Baron that the bankruptcy sale of the account receivable is irrelevant to its allegations that Mr. Natanzon directed, in violation of the settlement agreement, transfers to ERN Israel.

> vi.   **Preclusive Effect of the Bankruptcy Court's Findings of Facts and Conclusions of Law in Appointing the Chapter 11 Trustee**

In concluding its discussion of Count I, the Court must address another matter raised by the parties, namely, the preclusive effect of the Bankruptcy Court's findings of facts and conclusions of law in its appointment of the Chapter 11 bankruptcy trustee, Mr. Coppel, on the issues of Mr. Natanzon's

compliance with his duty to operate ERN in the ordinary course of
business and to use best efforts to maximize profitability.

In arguing against defendants' allegation of the prematurity
of its claims against Mr. Natanzon, Baron sweepingly asserts that

> [t]here is no merit to Mr. Natanzon's claim that he had
> not breached his MOU/Rider settlement obligations as of
> that date.  In fact, the Bankruptcy Court's findings of
> fact and conclusions of law in appointing a Chapter 11
> trustee are res judicata on this point since the
> Bankruptcy Court expressly found that Mr. Natanzon
> failed to operate ERN in the ordinary course of
> business, failed to maximize ERN's profitability, and,
> most particularly, failed to exercise fairness and good
> faith in his conduct toward Baron.

(Paper no. 124, 47).  Defendants counter that plaintiff has
failed to meet the demanding requirements of offensive collateral
estoppel.[37]  (Paper no. 129, 69-75).  The Court agrees.  While

---

[37] Defendants state that "Baron's argument for offensively
applying collateral estoppel to statements made by Judge Schneider"
during the bankruptcy proceeding lacks merit for three reasons: (1)
Mr. Natanzon did not have a "full and fair" opportunity to litigate
the "best efforts" issues at the May 2004 hearing; (2) the legal basis
for the bankruptcy case differs from the present breach of contract
action seeking a personal judgment against Mr. Natanzon; and (3) Judge
Schneider's comments do "not clearly indicate the precise factual
basis on which a trustee was appointed for ERN."  (Paper no. 129, 39-
40).  Defendants point out that Section 1104(a) of the U.S. Bankruptcy
Code enumerates several bases on which a trustee may be appointed,
including "fraud, dishonesty, incompetence or gross mismanagement of
the affairs of the debtor by current management[,]" and neither Judge
Schneider's statements at the hearing nor the actual appointment
Order, (Paper no. 129, Exhibit 13), indicates on what exact basis he
made his decision.  (Paper no. 129, 43).  Furthermore, Defendants
contend that, in any event, a finding that a trustee should be
appointed is "not equivalent to a determination that Mr. Natanzon
personally failed to use his best efforts to maximize ERN's
profitability."  Id.

plaintiff's reply is more focused than its first filing[38] and
raises legitimate questions as to the admissibility at trial of
the Bankruptcy Court's findings and decision to remove Mr.
Natanzon as current manager of ERN due to gross mismanagement of
the company, plaintiff has nonetheless failed to demonstrate its
entitlement to collateral estoppel, especially on the broad terms
sought which include preclusion as to the "best efforts"
provision.[39]   While there is certainly some overlap between the

---

[38] In its second filing, Baron takes issue with defendants'
contention that Mr. Natanzon did not have a "full and fair
opportunity" to prove that he operated ERN in the ordinary course of
business at the May 2004 bankruptcy hearing.  (Paper no. 135, 17).
Plaintiff believes that providing Mr. Natanzon with a second
opportunity to prove he used his "best efforts" to manage ERN would be
unfair, and it maintains that the "issue in the May 2004 bankruptcy
trustee hearing was whether management (meaning Rony Natanzon, the
sole member Manager of ERN) had so grossly mismanaged ERN's affairs
that it could not be entrusted with the company in bankruptcy as
debtor-in-possession."  Id.  According to Baron, there is nothing
ambiguous about Judge Schneider's findings that there was a failure to
properly keep financial records or accounts, operate ERN according to
the law, and pay taxes as well as his findings regarding inter-family
transactions and the payment of insider loans rather than creditors.
Id.

[39] Maryland courts employ a four-part test to determine the
applicability of the doctrine of collateral estoppel in a given case:
"(1) Was the issue decided in the prior adjudication identical with
the one presented in the action in question?  (2) Was there a final
judgment on the merits? (3) Was the party against whom the plea is
asserted a party or in privity with a party to the prior adjudication?
(4) Was the party against whom the plea is asserted given a fair
opportunity to be heard on the issue?"  Colandrea v. Wilde Lake
Community Association, Inc., 761 A.2d 899, 909 (Md. 2000) (citation
omitted).  The Fourth Circuit employs a similar five-part test, and
has stated that, "[t]o apply collateral estoppel or issue preclusion
to an issue or fact, the proponent must demonstrate that (1) the issue
or fact is identical to the one previously litigated; (2) the issue or
fact was actually resolved in the prior proceeding; (3) the issue or
fact was critical and necessary to the judgment in the prior
proceeding; (4) the judgment in the prior proceeding is final and
valid; and (5) the party to be foreclosed by the prior resolution of
the issue or fact had a full and fair opportunity to litigate the

finding of "gross mismanagement" and the issues of Mr. Natanzon's operation of ERN in the ordinary course and use of "best efforts," this Court is not prepared to say on the argument and authorities presented that Judge Schneider's ruling on the removal of Mr. Natanzon for gross mismanagement has any preclusive effect on these issues of Mr. Natanzon's contractual performance.

###    C.    Counts III and IV: Intentional Interference with Contractual Relations and Civil Conspiracy to Interfere

In support of their motion for summary judgment on Counts III and IV, defendants make two arguments: (1) Baron's success on either claim is dependent upon a finding of material breach of the settlement agreement; and (2) because knowledge is an essential element of the tort of intentional interference, defendants Tova Natanzon and Harold Taylor are entitled to summary judgment as they did not know the terms of the settlement

---

issue or fact in the prior proceeding.  In re Microsoft Corp. Antitrust Litigation, 355 F.3d 322, 326 (4th Cir. 2004) (citations omitted).  As defendants point out, when the doctrine applies, "facts or issues decided in the previous action are conclusive only if identical to facts or issues presented in the subsequent proceeding." See id. at 388-389 (citations omitted).  Moreover, great caution is required, especially in the application of offensive collateral estoppel.  See  In re Microsoft Corp. Antitrust Litigation, 355 F.3d 322, 326-327 (4th Cir. 2004) (citations omitted).  See also Bouchat v. Champion Products Inc., 327 F.Supp. 2d 537, 544 (D.Md. 2003) ("the application of offensive collateral estoppel is subject to equitable considerations and the 'broad discretion' of the Court") (citing Parklane Hoisery v. Shore, 493 U.S. 322, 330 (1979)).

agreement at the time of its alleged breach by Mr. Natanzon.[40]   In
its opposition,[41] Baron counters that breach of contract is not an
essential element of the tort of intentional interference with
contractual relations, but that it is undisputed that Mr.
Natanzon materially breached the settlement agreement.
Additionally, it maintains that Tova Natanzon, Harold Taylor, and
Amit Natanzon were all knowledgeable about the MOU and Rider
settlement agreement.[42]

The Court agrees with plaintiff that proof of breach of
contract is not an essential element of the tort of intentional
interference with contractual relations.  Plaintiff has cited
several cases supporting its position that breach of contract is
not a necessary element for this tort.  Trimed, Inc. v. Sherwood
Medical Co., 977 F.2d 885, 889 (4th Cir. 1992) (applying Maryland
law) ("proof of breach of contract is not an essential element of
the tort") (quoting Lake Shore Investors v. Rite Aid Corp., 509
A.2d 727, 729 (Md. App. 1986)); Robert M. Sharrow, Chartered v.

---

[40] According to footnote 1 of plaintiff's opposition memorandum,
by stipulation with defendants, defendant Vered Natanzon Taylor is not
part of defendants' motion for summary judgment as she has been
unavailable for deposition due to recently giving birth.  (Paper no.
125, 1, n.1).

[41] Given that plaintiff's opposition to defendants' motion for
summary judgment on Counts III and IV is exactly that, opposition
rather than a cross motion for summary judgment, the Court will of
course evaluate the evidence before it in a light most favorable to
the non-moving party, i.e. Baron.  See CSK Transportation, 404 F.Supp.
2d at 871 (citing Matsushita, 475 U.S. at 587).

[42] There appears to be no dispute among the parties that defendant
Martin Taylor did have knowledge about the settlement agreement.

State Farm Mutual Auto Ins. Co., 511 A.2d 492, 497 (Md. 1986)

("As we said in [Natural Design, Inc. v. Rouse Co., 485 A.2d 663

(1984)], the tort may arise where intentional interference by a

third party with another in his business or occupation induces a

breach of an existing contract or where, absent a breach of

contract, there is malicious or wrongful interference with an

economic relationship.").  See also Sensormatic, 455 F.Supp.2d at

426 (citing Natural Design, 485 A.2d at 674).  Accord 21 M.L.E.

Torts § 35 (updated Dec. 2006).

As for defendants' second argument, the Court agrees that

knowledge of the existing contract at issue is an element of

tortious interference with contract under Maryland law.  See,

e.g., id. (citing Fowler v. Printers II, Inc., 598 A.2d 794, 802

(Md. App. 1991)).  However, there is currently sufficient

evidence before the Court that would allow a reasonable jury to

conclude that defendants, including Tova Natanzon, Harold Taylor,

and Amit Natanzon, had actual or constructive knowledge of the

settlement agreement and its terms.

First, this evidence includes the family relationships of

the defendants.  It is not unreasonable to infer from the

familial relationship that family members would discuss

significant employment and business dealings with each other.

Second, and perhaps more notably, Tova Natanzon, Harold Taylor,

and Amit Natanzon have all performed extensive work for both ERN

and MAP.[43]  Given the depth of their involvement with both

companies, a reasonable jury certainly could conclude that it is

highly unlikely that defendants were completely unaware of the

settlement or any of its terms, not to mention the possible

impact that the formation and existence of MAP would have on

ERN.[44]

In their papers, defendants make much of the fact that

through affidavits and deposition statements, Tova Natanzon and

Harold Taylor averred that they either had no knowledge of the

terms of the settlement agreement or no recollection of it or its

provisions.  (Paper no. 110, 34 and Exhibits L and M; Paper no.

129, 47-49).  Whether either defendant has spoken truthfully is a

credibility determination that the Court simply may not make and

that must remain the province of the jury.  See Anderson, 477

U.S. at 255.  Considering the close relationships of Tova

---

[43] According to a recent affidavit, prior to its bankruptcy, Tova
Natanzon handled human resources and payroll matters at ERN.  (Paper
no. 110, Ex. L).  She is now in charge of payroll processing for MAP.
Id.  Moreover, Tova Natanzon is recorded as being the founder of MAP,
(Paper no. 125, Ex. 8, 59), and as per her November 16, 2006
deposition testimony, she put up $100,000 to help establish MAP.
(Paper no. 125, Ex. 9, 57).  According to his own recent affidavit,
Harold Taylor was "Special Projects Coordinator" for ERN until late
2003.  (Paper no. 110, Ex. M).  He currently holds the same position
at MAP.  Id.  Amit Natanzon has also worked at both ERN and MAP.
(Paper no. 125, Ex. 8, 55, 150, Ex. 10, 56-57).

[44] There is undisputed evidence before the Court that Amit
Natanzon was, along with Martin Taylor, one of the driving forces
behind the formation of MAP and its three subsidiaries.  (Paper no.
125, Ex. 8, 111-112; Ex. 48, 259-260).  There is also November 2006
deposition testimony from Mr. Natanzon that Harold Taylor played a
significant role in transferring what was known as the BTF portfolio
from ERN to MAP.  (Paper no. 125, Ex. 2, 314).

Natanzon and Harold Taylor with the other defendants as well as
the companies at the heart of this matter, the Court agrees with
plaintiff that any "subjective claims of ignorance must be
submitted to the jury." (Paper no. 110, 6-7). Defendants'
motion for summary judgment on Counts III and IV is denied.

### D.   Count X: Fraudulent Conveyance of Bankruptcy Sale Purchase Rights to ERN Acquisition, LLC

Count X of Baron's Second Amended Complaint alleges that
prior to the closing of the ERN bankruptcy sale and without
receiving fair consideration, Mr. Natanzon transferred his
contractual rights to purchase ERN's assets to ERN Acquisition,
LLC. (Paper no. 45, 58). Because Baron believes Mr. Natanzon
made this transfer with (a) an intent to interfere with Baron's
own rights as a creditor; and/or (b) at a time when Mr. Natanzon
intended or believed he (i) would either incur debts beyond his
ability to satisfy such debts as they matured and/or (ii) "would
leave himself with insufficient capital to satisfy his
outstanding obligations[,]" Baron is requesting that the transfer
be voided or set aside pursuant to Md. Code Ann. Comm. L. Art. §§
15-201 through 15-209 and has sued ERN Acquisition as a
fraudulent transferee.[45]  Id.

---

[45] Under Maryland law, the term "conveyance" encompasses "every
payment of money, assignment, release, transfer, lease, mortgage, or
pledge of tangible or intangible property, and also the creation of
any lien or incumbrance." Md. Code Ann. Comm. L. Art. § 15-201. The
Maryland Fraudulent Conveyance Act enumerates four ways in which an
individual may violate its provisions. Regardless of actual intent, a
person may not transfer assets without fair consideration if he is

Defendants argue that "Count X fails as a matter of law because there has never been any conveyance from [Mr.] Natanzon to ERN Acquisition, LLC of either the ERN Assets themselves or [Mr.] Natanzon's right to buy the Assets.  The ERN assets were purchased from ERN's bankruptcy estate by ERN Acquisition, LLC - not Rony Natanzon."  (Paper no. 110, 36).  In the alternative, they contend that even if the right to purchase ERN's assets was transferred to ERN Acquisition, the transfer was not fraudulent because Acquisition's assumption of the liabilities set forth in the closing bankruptcy documents amounted to consideration.  (Paper no. 129, 54).

Plaintiff counters that there was a conveyance of valuable contract rights by Mr. Natanzon in that the bid to purchase the ERN assets was made in his name and not that of Acquisition.  His bid was accepted by the bankruptcy trustee and approved by the Court at a July 7, 2004 sale hearing. (Paper no. 125, Exhibit 41).  Acquisition could not have placed a bid or have had it

---

already insolvent or will be rendered so by the conveyance or if he "is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital[.]" Id. at §§ 15-204 and 15-205. Similarly, a person may not make a conveyance or incur an obligation without fair consideration if he "intends or believes that he will incur debts beyond his ability to pay as they mature[.]" Id. at § 15-206.  Finally, a "conveyance made or obligation incurred with actual intent . . . to hinder, delay, or defraud present or future creditors, is fraudulent" as to those creditors. Id. at § 15-207.

   As defendants point out, plaintiff has utilized the term "transfer" instead of conveyance.  (Paper no. 110, 35, n.21).  For the purposes of this opinion and this case, this is a distinction without a difference, and the Court will use the terms "transfer" and "conveyance" interchangeably.

approved because it did not exist until July 8, 2004. (Paper no. 110, Exhibit 10).  Plaintiff maintains that judicial estoppel precludes Mr. Natanzon from arguing that the bid was not his but Acquisition's.

In its supplemental opposition to defendants' motion for summary judgment, plaintiff also argues that defendants have not addressed all of the allegations of the Second Amended Complaint, namely that the transfer of purchase rights was made with actual intent to hinder, delay or defraud creditors.  In addition, it contends that when Acquisition obtained ERN's assets, it did not assume all of Mr. Natanzon's obligations; therefore, he retained obligations but "no longer had any assets to pay for them.  In fact, by virtue of the closing, [Mr.] Natanzon's financial position had substantially deteriorated." (Paper no. 135, 21). Finally, plaintiff argues that the transfer of the right to purchase ERN's assets satisfies the badges of fraud under Maryland and Fourth Circuit law.

The Court finds that the right to purchase the ERN assets was a valuable right.  And it is this <u>right</u> to purchase, not the <u>actual</u> purchase, that is at the core of Count X.  When Mr. Natanzon bid on this right to purchase ERN's assets, he did so in the name of "Rony Natanzon or his designee." (Paper no. 135, Exhibit 52).  The bankruptcy trustee recommended that this bid be accepted, (Paper no. 135, Exhibit 53, 194-195), and by Court Order, Judge Schneider adopted this recommendation. (Paper no.

135, Exhibit 55).   Rony Natanzon possessed not only the right to purchase the ERN estate but also to designate what other person or entity might ultimately do so.   At some point prior to the Bankruptcy Court's approval of the sale of ERN's assets to Acquisition on July 20, 2004, Mr. Natanzon made a designation or assignment of his rights.   The exact timing of this designation is not relevant as it always remained Mr. Natanzon's choice whether to name and assign his rights to a designee, and it is uncontroverted that he in fact did so.

The question then becomes whether, in naming a designee and assigning his rights to purchase ERN's assets to Acquisition, Mr. Natanzon, with either actual or presumptive intent, fraudulently advantaged Acquisition to the detriment of his own creditors. See Cruickshank-Wallace v. County Banking and Trust Co., 885 A.2d 403, 415 (Md. App. 2005) (citations omitted).   The Court agrees with plaintiff that the facts surrounding this issue are in dispute.   Therefore, defendants' motion for summary judgment on Count X is denied.

### III.   Conclusion

For the foregoing reasons, the Court DENIES both parties' Motions for Summary Judgment on Count I and DENIES defendants' Motion for Summary Judgment on Counts III, IV, and X.


Date:   3/21/07                           /s/
                                   Susan K. Gauvey

United States Magistrate Judge